# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JEAN M. KAECHELE, an Individual, | ) | CIVIL ACTION NO.: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **COMPLAINT** |
| CLEAR CHANNEL BROADCASTING, | ) | |
| INC., a Nevada Corporation, and | ) | |
| CHARLES TAYLOR WALET III, | ) | |
| commonly known as TAYLOR WALET, | ) | **Trial By Jury Demanded** |
| | ) | |
| Defendants. | ) | |
| | ) | |

COMES NOW the plaintiff, Jean M. Kaechele, through her attorney of record, Michael J. Merrick and Merrick Law Firm LLC, and for her complaint against defendants states as follows:

### Nature of the Action: "Paybacks Are Hell"

1.  Plaintiff Jean Kaechele worked for defendant Clear Channel Broadcasting as a General Sales Manager supervising several account executives in the Omaha office. In October 2007, one of defendant Clear Channel's human resources representatives from the corporate office in Texas interviewed plaintiff regarding a hostile work environment complaint initiated by another employee against defendant Taylor Walet, Vice President and Market Manager in charge of the Omaha office.

2.  Not long after the conclusion of the internal investigation, defendant Walet confronted plaintiff and told her that he knew she had participated in the investigation against him, and that it "went nowhere, but nice try." He warned her that she was now on his "bad side" and "on the black list at corporate" for participating in the investigation, and threatened her to "just try to ever call them (human resources) again and see what happens. I don't forget these things. Paybacks are hell."

3. During the ensuing months, defendants continued to subject plaintiff and other employees to a sexually hostile work environment. In January 2009, defendant Walet found a way to get rid of plaintiff—by improperly including her in a company-wide reduction-in-force of the lower-level account executives. Within days, he posted plaintiff's General Sales Manager position and subsequently hired someone to replace her. Plaintiff seeks redress for the hostile work environment and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Nebraska Fair Employment Practice Act ("NFEPA"), and Nebraska common law.

## Exhaustion of Administrative Remedies

4. Defendant Clear Channel is a covered employer under Title VII and NFEPA. Plaintiff timely filed Charges of sex discrimination and retaliation with the Nebraska Equal Opportunity Commission ("NEOC") which were cross-filed with the U.S. Equal Employment Opportunity Commission ("EEOC"). Plaintiff commenced this action within 90 days of her receipt of notice of right to sue letters from the NEOC and EEOC. Plaintiff has exhausted her administrative remedies and timely commenced this action.

## Jurisdiction & Venue

5. Subject matter jurisdiction is premised on the federal question jurisdiction, 28 U.S.C. § 1331, as plaintiff's claims under Title VII, 42 U.S.C. §§2000e *et seq*., arise under federal law. The Court has supplemental jurisdiction over plaintiff's state law claim pursuant to 28 U.S.C. §1367.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. §2005e-5(f)(3) as defendants reside and do business in this judicial district, a substantial part of the events or omissions giving rise to these claims occurred in this judicial district, the

unlawful employment practices occurred in this judicial district, and plaintiff would have continued to work in this judicial district but for the unlawful employment practices.

## The Parties

7. Plaintiff Jean M. Kaechele is a resident of Omaha, Nebraska. On or about October 4, 2005, she commenced employment with defendant Clear Channel Broadcasting, Inc. as a General Sales Manager and the Director of Sales Training in the Omaha office.

8. Defendant Clear Channel Broadcasting, Inc. ("Clear Channel") is a Nevada Corporation with corporate headquarters in San Antonio, Texas. Clear Channel owns and operates radio stations throughout the United States.

9. Defendant Charles Taylor Walet III, commonly known as Taylor Walet ("Walet"), was hired by Clear Channel in or about June 2007 as Vice President and Market Manager in charge of the Omaha office. He had supervisory authority over Plaintiff.

## Factual Allegations Common to All Claims

### *Plaintiff's Career With Clear Channel*

10. Clear Channel purports to have a policy of "zero tolerance" for sexual harassment and retaliation.

11. Clear Channel also has a performance management policy which includes procedures designed to give employees notice of, and an opportunity to improve, any work performance deficiencies.

12. Clear Channel also has policies in place covering employee termination procedures, including the requirements of having a legitimate reason for the termination and the approval of the human resources department and the firing manager's supervisor.

13. Plaintiff had over 18 successful years in the radio industry, 10 of those years as a manager. During her career in radio, she held the positions of Account Executive, Training Director, Local Sales Manager, National Sales Manager, General Sales Manager and Director of Sales. She earned the Manager of Radio Marketing (MRM) accreditation from the Lytle Organization, Talent Focused Management (TFM) certification from the Center for Sales Strategies in Tampa Florida, and Leadership for Managers (LFM) certification from Clear Channel University in Philadelphia.

14. As a General Sales Manager and the Director of Sales Training in the Omaha office, plaintiff supervised approximately 10 Account Executives whose primary function was to sell radio advertising time.

15. At all times Plaintiff's work performance met or exceeded defendants' legitimate expectations. She never received any negative assessments, discipline or warnings about her work performance for Clear Channel. To the contrary, after four months with the company she was promoted to General Sales Manager of a second Omaha radio station. After her first two years, nearly 70% of the Omaha revenue increase came from her two stations. Plaintiff received several raises and bonuses over the years, and in 2006 was recognized as "Employee of the Week" by Mark Mays, then the Chief Executive Officer of Clear Channel Communications.

*Walet Hires Charleston & Creates a Hostile Work Environment*

16. In or about September 2007, Walet hired his friend Dan Charleston ("Charleston") to be Director of Sales ("DOS") for the Omaha office. Charleston reported directly to Walet and became Plaintiff's direct supervisor.

4

17. Beginning in or about September 2007, Walet and Charleston subjected Plaintiff and other employees in the Omaha office to a hostile work environment consisting of sexual innuendo, vulgarity, and demeaning conduct towards female employees on a daily basis.

### *Human Resources Investigates & Calls Plaintiff as a Witness*

18. In October 2007, Clear Channel human resources representative Renee Zabel ("Zabel") from the San Antonio corporate office called plaintiff to question her about a hostile work environment complaint against Walet and Charleston submitted by another employee.

19. Zabel asked plaintiff whether she was aware of any inappropriate comments Walet or Charleston had made in the Omaha office.

20. Plaintiff reported several incidents to Zabel. She told Zabel that Walet had congratulated a sales representative by saying, "Way to gas those cock-suckers."

21. Plaintiff also told Zabel that Charleston had remarked about a former competitor, "Do you want to watch me slap his dick, he's a pussy."

22. Plaintiff also told Zabel that when Charleston had learned that his sales assistant might not have returned to work from maternity leave, he told plaintiff, "I hope she comes back, where else am I going to get my cheap thrills and fantasies," while he gestured cupping her breasts with his hands.

23. Zabel cut the phone call short and said she would call plaintiff back to finish the interview, but she never called her back.

24. Plaintiff subsequently reported similar inappropriate comments made by Walet and Charleston to Julie Wolfe, Clear Channel's human resources representative in the Omaha office.

25. No one from Clear Channel ever advised plaintiff of the results of any investigation.

26. Upon information and belief, Clear Channel purported to find that no sexual harassment or sexually inappropriate conduct had occurred, but foul language was commonly used in the Omaha office.

27. In or about late 2007, Clear Channel corporate human resources representatives conducted employment law and performance management training in the Omaha office.

28. Walet and Charleston laughed off the training as a joke.

### *The Hostile Work Environment Remains Unabated*

29. Walet and Chaleston began to retaliate against plaintiff and continued to create and foster a sexually hostile work environment in the Omaha office including, but not limited to, the conduct described below.

30. In or about November 2007, during a meeting in Chaleston's office plaintiff commented that it was cold and turned up the thermostat. Charleston looked at her breasts and said, "Oh yeah, I can see it's nipply in here." Plaintiff left the room and never wore that blouse again.

31. In or about January 2008, Walet told Charleston, "You're out of whipped cream at your place, I used it all this weekend!" Charleston replied, "Slow down or you'll have a stroke!" They were "joking" about Walet using Charleston's apartment for having sex when Charleston was out of town.

### *Walet Threatens Plaintiff With Reprisals*

32. In or about February 2008, when plaintiff asked Walet about the amount of her 2007 bonus, he became angry and told her he knew exactly who had participated in the human resources investigation and what each person said.

33. Walet also told plaintiff that Clear Channel Radio President and CEO John Hogan ("Hogan") personally called him "to apologize for the inconvenience" of the investigation.

34. Walet told plaintiff that the employees who participated in the investigation were "on the black list at corporate and look like fools."

35. Walet told plaintiff that the complaints against him "went nowhere, but nice try."

36. Walet told plaintiff that he and Hogan were "drinking buddies from way back" and that he (Walet) has other "friends in high places" at the company and therefore "it is ridiculous for you to even try" to complain.

37. Walet told plaintiff that she was now on his "bad side" for participating in the investigation.

38. Plaintiff replied to Walet that human resources had called her and she simply answered their questions and told the truth.

39. Walet then warned plaintiff, "Just try to ever call them (human resources) again and see what happens. I don't forget these things. Paybacks are hell."

### *The Hostile Work Environment Continues*

40. In or about March 2008, Charleston said he was going on a sales call with another seller to Bag N Save grocery store. Regarding that sales call he commented, "Don't worry, I'll bag her twice, I always do." Marnie Simpson ("Simpson"), whom Walet had recently promoted

from Account Executive to General Sales Manager, replied, "You're my kind of guy, can you give my husband some lessons?"

41. In or about April 2008, Charleston was recruiting a female salesperson to join the company. During a phone call with her, he asked her to meet him for drinks to discuss the job. He also asked her whether her breasts were "real."

42. In or about April 2008, Charleston read out loud sexually explicit e-mails he had been exchanging with the above-mentioned female recruit.

43. In or about April 2008, Walet, Charleston and other male employees were in the hallway pushing each other and laughing. One male employee said to Charleston, "Dan, did you see that? Walet grabbed my balls, he grabbed my balls! You gay wad Taylor!"

44. In or about April 2008, while Charleston walked in the hallway behind Simpson he told her to "hold up." She turned around and grabbed her breasts and said, "I have very little to 'hold up,' have you seen these puppies?" They continued to talk about her breasts, and she concluded by saying that Walet "is so short I could breast feed him standing up."

45. In or about May 2008, Charleston told another male employee that he was going to hire a new seller, a young college graduate he described as a "blond bombshell" and "beauty pageant queen." He said she had "big tits and blond hair, those are her greatest assets. Why else would I hire a 22 year-old female fresh out of college?"

46. In or about July 2008, Walet showed plaintiff on his computer screen the portion of her second quarter bonus she had earned. It was nearly 100% of the possible bonus. Walet said, "Do you think you deserve it? The jury's still out on that one."

47. In or about October 2008, Walet hung posters in the office that said "AFDI," the acronym for his slogan, "Actually Fucking Do It." Walet also presented those posters to employees during sales and department head meetings.

48. In or about November 2008, Walet told plaintiff to train Marnie Simpson on certain advertising pricing software. When plaintiff nodded her head up and down gesturing "yes," he replied, "Are you just neck-fucking me or do you actually understand?"

49. In or about December 2008, Walet e-mailed plaintiff an offensive joke about vibrators and masturbating.

50. In or about December 2008, Walet wondered aloud what it would be like to have sex with a certain Clear Channel female Account Executive.

51. In or about December 2008, John Hiatt ("Hiatt"), the recently hired Director of Sales who had replaced Charleston, Marnie Simpson, and plaintiff were having a conversation about a new hire. Simpson told Walet that she gave the potential new hire a "blow job" to get him to accept the position. Walet then asked plaintiff what she had done to get the new hire on board. Plaintiff looked down and ignored him. Walet then said, "Nothing, just as I suspected. You're the best Marn, you'll go far with me."

### *Walet Sees His Chance For Payback*

52. In or about early December 2008, Walet called plaintiff, Hiatt and Simpson into a meeting and told them the company may be considering reducing the number of Account Executives and they should begin to think about who should be let go. Plaintiff asked him if they had any reason to worry about their jobs as managers. Walet said they had no reason to worry, their jobs were safe.

9

53. In or about the middle of December 2008, Hiatt told plaintiff that he thought Walet would not acknowledge her capabilties because, "honestly, I think he is holding a grudge and because you're a woman." Hiatt told plaintiff he would try to help her with the situation with Walet. He also said he was afraid that Walet was writing her out of her position.

54. On or about January 12, 2009, Walet advised plaintiff, Hiatt and Simpson that corporate had directed him to identify seven Account Executives to be terminated as part of a company-wide reduction-in-force later that month.

55. Walet asked plaintiff, Hiatt and Simpson to rank all of the Account Executives and identify those who should be retained and those who should be let go as part of the upcoming reduction.

56. Subsequently, Walet had a meeting with Hiatt, plaintiff and Simpson to discuss the upcoming layoffs. Walet listened to plaintiff's and Simpson's recommendations as to which Account Executives should be included in the reduction. Walet told them he had also spoken with Charleston for his input even though he had left the company in or about July 2008.

### *Walet Enjoys His Payback & Fires Plaintiff*

57. On or about January 20, 2009, the day the seven Account Executives were to be laid off, plaintiff was asked to go to a conference room when she arrived at the office that morning. Walet was waiting there smiling. With a grin on his face he said, "So starts the day. We're letting you go due to a reorganization."

58. Plaintiff replied, "Yeah, right, that's not what this is about." Walet smiled and asked for her keys.

59. Each of the seven Account Executives whose employment was terminated as part of the reduction had previously either received a work performance warning or been placed on a performance improvement plan pursuant to Clear Channel's performance management policy.

60. Plaintiff had not received a work performance warning or been placed on a performance improvement plan before Walet fired her. Defendants failed to follow the Clear Channel performance management policy with respect to plaintiff's employment.

61. Defendants failed to follow the Clear Channel policy of zero tolerance of sexual harassment and retaliation in this case.

62. Defendants failed to follow the Clear Channel employee termination policies and procedures with reespect to plaintiff's termination.

63. Simpson, the other General Sales Manager, kept her job even though plaintiff had trained her to be a GSM just six months earlier when Walet promoted her with no prior management experience.

64. On or about February 10, 2009, plaintiff learned that she did not get one of the several Clear Channel regional yield manager/revenue manager positions she had interviewed for in Houston on January 14, 2009.

65. Upon information and belief, Walet and/or other Clear Channel employees thwarted her opportunity for one of those positions in retaliation against her because she had complained about discrimination.

66. On or about February 16, 2009, Walet posted plaintiff's General Sales Manager position on the hiring page of Clear Channel's website.

67. Upon information and belief, in or about July 2009 defendants hired a less-experienced employee to replace plaintiff as General Sales Manager even though she had no prior experience in the radio industry.

## COUNT I

## TITLE VII HOSTILE WORK ENVIRONMENT CLAIM AGAINST CLEAR CHANNEL

68. Clear Channel subjected plaintiff and other employees to unwelcome and offensive sexual harassment which was sufficiently severe or pervasive to alter the terms and conditions of plaintiff's employment and create an abusive work environment for plaintiff and the other employees working in the Omaha office in violation of Title VII.

69. The hostile work environment culminated in plaintiff's termination.

70. As a direct and proximate result of Clear Channel's unlawful conduct, plaintiff suffered damages.

## COUNT II

## TITLE VII RETALIATION CLAIM AGAINST CLEAR CHANNEL

71. Plaintiff incorporates by reference paragraphs 1 through 70 as though fully set forth in this Count II.

72. Clear Channel retaliated against plaintiff in violation of Title VII by perpetuating the hostile work environment, refusing to hire her for one of the Clear Channel regional yield manager/revenue manager positions, and terminating her employment because she had participated in the human resources investigation and complained about sexual harassment.

73. As a direct and proximate result of Clear Channel's unlawful conduct, plaintiff suffered damages.

## COUNT III

## NFEPA HOSTILE WORK ENVIRONMENT CLAIM AGAINST CLEAR CHANNEL

74. Plaintiff incorporates by reference paragraphs 1 through 67 as though fully set forth in this Count III.

75. Clear Channel subjected plaintiff and other employees to unwelcome and offensive sexual harassment which was sufficiently severe or pervasive to alter the terms and conditions of plaintiff's employment and create an abusive work environment for plaintiff and the other employees working in the Omaha office in violation of the NFEPA.

76. The hostile work environment culminated in plaintiff's termination.

77. As a direct and proximate result of Clear Channel's unlawful conduct, plaintiff suffered damages.

## COUNT IV

## NFEPA RETALIATION CLAIM AGAINST CLEAR CHANNEL

78. Plaintiff incorporates by reference paragraphs 1 through 77 as though fully set forth in this Count IV.

79. Clear Channel retaliated against plaintiff in violation of the NFEPA by perpetuating the hostile work environment, refusing to hire her for one of the Clear Channel regional yield manager/revenue manager positions, and terminating her employment because she had participated in the human resources investigation and complained about sexual harassment.

80. As a direct and proximate result of Clear Channel's unlawful conduct, plaintiff suffered damages.

## COUNT V

## NEBRASKA COMMON LAW TORTIOUS
## INTERFERENCE CLAIM AGAINST TAYLOR WALET

81.     Plaintiff incorporates by reference paragraphs 1 through 80 as though fully set forth in this Count V.

82.     Plaintiff had a valid expectation of continued employment with Clear Channel.

83.     Walet was aware of plaintiff's expectation of continued employment.

84.     Without justification, Walet intentionally and improperly interfered with plaintiff's expectation of continued employment.

85.     Walet's interference was done solely with malice and/or for his own personal interests as described above.

86.     Walet also interfered with plaintiff's employment because she refused to join him and others like Charleston and Simpson in creating what they thought was a "fun" work environment consisting of vulgar and crude comments and acts.

87.     Walet also interfered with plaintiff's employment because he irrationally feared that plaintiff remained loyal to his predecessor, former Omaha Market Manager Donna Baker, and therefore was disloyal to him. Walet classified plaintiff and certain others as "Donna Lovers."

88.     Walet's interference with plaintiff's continued employment was not for any lawful, legitimate purpose of Clear Channel.

89.     As a direct and proximate result of Walet's unlawful conduct, plaintiff suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully prays for judgment in her favor and against defendants and for the following relief:

A. Lost wages and benefits in an amount to be proven at trial;

B. Compensatory damages in an amount to be proven at trial;

C. Pre-judgment and post-judgment interest;

D. Punitive damages;

E. Appropriate equitable relief including back pay, reinstatement and/or front pay;

F. A declaratory judgment that defendants violated plaintiff's rights as alleged;

G. An injunction against future acts of discrimination or retaliation against plaintiff;

H. Plaintiff's reasonable attorneys' fees and costs incurred herein; and

I. For such further relief that the Court may deem just and equitable.

## JURY DEMAND

Plaintiff demands trial by jury on all issues herein.

## REQUEST FOR PLACE OF TRIAL

Plaintiff requests Omaha as the place for trial.

JEAN M. KAECHELE

By: /s/ Michael J. Merrick
    Bar Number: 19855
    Attorney for Plaintiff
    Merrick Law Firm LLC
    3801 Harney Street, Suite 100
    Omaha, Nebraska 68131
    Tel. (402) 933-4256
    Fax (312) 269-0800
    E-mail: merrick@merricklawfirm.com